## Miller *versus* Miller.

1. The rule as to duress *per minas* has now a broader application than formerly.

2. Where one has the property of another in his power, so that he can exert his control over it to the prejudice of the other, a threat to use this control may enable the other to avoid an obligation obtained without consideration by means of the threats.

3. Mere threats of injury to property, without power over it to enable the party to execute the threats, are not duress *per minas*.

4. The constraint which takes away free agency, and destroys the power of withholding assent to a contract, must be one which is imminent and without immediate means of prevention, and such as would operate on a person of a reasonable firmness of purpose.

5. A threat to withhold payment of a debt, or to refuse performance of contract, or to do an injury which may be at once redressed by legal process, is not duress *per minas*.

6. There is not a duress *per minas* in equity which does not exist at law.

7. A chancellor will refuse specific execution of a contract for a reason less than would constitute duress *per minas*, or will set aside a bargain for extortion or undue influence on a weak mind or under circumstances of a confidential relation, but will not set aside an agreement for duress *per minas* when the law would not.

8. The facts in this case did not constitute duress *per minas*.

May 9th 1871. Before THOMPSON, C. J., AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the Court of Common Pleas of *Franklin county*: No. 66, to May Term 1861.

The action in this case was by Nancy A. Miller against David Miller, commenced February 5th 1868, on a note of which the following is a copy:—

$1200 on or before the first day of April, one thousand eight hundred and forty-eight, we or either of us promise to pay Nancy Miller, or order, the sum of twelve hundred dollars with interest from this date without defalcation for value received, given under our hands and seals this first day of April, one thousand eight hundred and forty-seven.

DAVID MILLER. [L. S.]<br>DANIEL MILLER. [L. S.]

On this note were the following endorsements:—

" This note settled in full.

NANCY A. MILLER."

Attest:—WM. ADAMS."

There were afterwards endorsed different payments of interest which were in full to April 1st 1854.

Also:—

[Miller *v.* Miller.]

"April 1st 1862, Give five hundred dollars interest on the within note for my home here, and the balance settled of the interest."

"April 1st 1862, Rec'd two hundred dollars of the principal on the within note."

"April 1st 1864, Settled the interest on the within note up to this date."

"April 1st 1864, Settled one hundred and eighty dollars of the principal on the within note."

The plaintiff alleged that the endorsement of the settlement was not binding, having been obtained by coercion, &c.

The cause tried October 20th 1870, before Rowe, J.

The plaintiff read the note in evidence and all the endorsements but "This note settled in full," and rested.

The defendant called William Adams, who testified that he wrote the endorsement of settlement, and the plaintiff signed it in his presence. Defendant then read the endorsement, and rested.

The plaintiff testified that her father, who died about 1835, left two farms, one of which the defendant, who was her brother, agreed to buy from the heirs at $30 per acre, which was afterwards reduced to $25 per acre, in consideration of his giving to the plaintiff and another sister named Catharine, a home for life, and to get their money at 5 per cent. The note in suit was for her share of the farm bought by the defendant. The agreement for the reduction of the price of the land was in writing, and contained nothing as to providing the sisters a home. The evidence in relation to that was objected to by the defendant, as varying a writing by parol. It was admitted, and a bill of exceptions sealed.

Plaintiff testified that she did housework, &c., for the defendant.

She further said : "After the giving of the note, for about fourteen years we settled, and he paid us the interest, part in money and part in notes. Then he became dissatisfied—thought the interest high, and said it was a sin to take interest. He said we ought to drop some of the interest if only six cents. He continually wanted us to drop interest until 1862; he got me to drop $500 and my sister the same. As soon as that was done, he said it was not enough. I said it was enough, that I thought we had done very well. We commenced to differ. He said he thought the fourteen years ought to be opened, and $75 per year to be deducted for board and lodging, for living there. We said we would do it. As soon as we agreed to this, he said it was not enough, that we ought to pay $100 per year. He got us pushed up to that. Then he said that was not enough. He wanted $700 more. We did not want to do these things. He threatened me that I ought to be kicked out of the house, at one time drew a

chair over me. He said we would defraud his children—all that kind of talk, over and over again, in different years from before 1862, up. He was always at us more before communion time than any other. At chance times, he would commence this talk at the table. He rendered the home disagreeable to me, very much so. In 1865, sister got lame from a fall on the ice. When we were differing, he said I had better not say too much, that the carpenter had left a hole, pointing to the door. I could not live there in any kind of peace, unless I had given up. We had no rest, no peace, without doing these things. Sometimes he was at it every day and every day, sometimes he would desist—and then begin again afresh. 1st April 1862, I only got $100 of the $200 receipted for. The way that happened, it was principal, and he gave me a note for it, and the receipt was entered for the $200. He only paid $100 on the note. He grumbled, and I took $100, the other $100 to be paid again. He never paid it. 1862 April 1st, $500, this was surrendered in consequence of his importunity and the influences narrated. 1st April 1864, the entries then made on the note were made without any money being received, in consequence of his claim for more from us for boarding and living, as narrated. April 1854, I only got $100 of the principal of the note and no interest. The rest is all gone. On 1st April 1864, I did not get any money. He induced me to throw off some more money, because we lived in the house. He demanded it. The reduction made 1st April 1864, left only $500 due on the note. I did these things because he demanded it. I did not want to do it. From 1st April 1864 to March 10th 1866, the date of settlement of note, he paid me no money. He paid me no money on that day, the day the note is marked, 'settled in full.' He gave no value at all. From April 1864 to March 1866, his treatment became worse. Defendant said we ought to do something—see where we would put our money, we were getting old. He asked whether we were not going to send for Adams. Sister at last said he might come, and he came and wrote the wills, and the note was marked settled. April 1864, he wanted a lien on the land in Maryland for $2000, not to be payable until our death, but interest to run from date. We were willing to will him $2000. He said if we could get any person to say it was not right he did not want the $2000. When Adams came, we consulted him a little. He said: ' Girls, indeed I would not do it.' This March 12th 1870. He said he wouldn't have the farm encumbered. Then we got the wills wrote. Adams and he went out and had a conversation, and came in and demanded the $1000 we two held against him on the notes, $500 each. He was all winter demanding the $500 he owed me on the note, and the $1000 which he wanted a judgment for on the farm, demanding like sum from sister. Then when Adams was there, we marked the notes settled.

[Miller *v.* Miller.]

He always said, pay your debts, and said I was insolvent. I thought I did not owe him."

On cross-examination she said : * * * "I can't remember whether the threat to kick me out of the house, was before or after March 12th 1866. He did not say he would kick us out if we would not give up the $500 and other sums. That was the object. I don't recollect that he used that language. He did not mention the money when he drew the chair—that was during the last year. I signed the words ' Settled in full,' because he had been at us all winter and abused us dreadfully and pushed us up to that point. I talked against it all winter. I called him a skinner and stripper. I don't know that I suggested the giving up of the $1000 when Adams was there. The abuse was, he said a great deal. He said if we would give it up, we could live and let live, and such talk. His abuse was all talk. I could have gone away from the house. I stayed because I thought I had a right. He never said : ' Unless you put a receipt in the note, I will use violence.' He was saying all the time, you ought, you ought, you ought. In 1864, he said you must give up the $1000 or leave the house.

For defendant William Adams said : " On the 12th of March 1866, I went to defendant's house. I went there to write wills for Nancy and Catharine. She told me they had a settlement to make with David before they would write their will. David was present, and presented a bill of $2000, which he claimed for buying a farm and superintending it for eighteen years. The girls resisted his claim or the manner he wished to receive it. He wanted a mortgage on the Maryland farm payable at their death and that of the survivor. They proposed to secure to him $2000 by will, but refused the mortgage. He was not satisfied. There was then much talk. Nancy contended that the services were not worth $2000. Nancy claimed to offset David's services in the farm with keeping his books. They talked from 8 o'clock to noon. After dinner, Nancy proposed that they would give to David $1000, which he at first refused to accept. He and I went out of the house and over the farm, and after my talking to him, when we came back, he agreed to accept it. After he agreed to accept it, five notes were presented, two to Catharine and three to Nancy. When I came across the note now in suit, Nancy said there was nothing due on that note, as it had been settled in 1864, and a note taken for $500—(one of the notes just produced). I then made the endorsement across its face ' settled in full.' She also said there was nothing due on the $168.64 note, and I wrote the endorsement on it also. She signed both settlements. On the $500 note I put the endorsement found on it—' March 12th 1866. This note satisfied by settlement in full of all accounts to date, and for boarding, &c., to April 1st 1866.

(Signed) ·          NANCY A. MILLER.

Attest :—WM. ADAMS.'

[Miller *v.* Miller.]

" Nancy produced the five notes, I think, that is my impression. Nancy and defendant each presented their claims, and each seemed to be getting the best side of the bargain. I heard no threats. I saw no undue influence used. I discovered no fear in Nancy of her brother. She seemed to act freely, and was capable of managing her affairs. David claimed $94 afterwards, but she and I insisted the settlement was in full, and he acquiesced. They then made an agreement about boarding for the future, which both parties signed."

There was other evidence on both sides, but none of importance bearing on the question of threats.

The plaintiff's 7th point was : " The acceptance by the plaintiff of the $500 note on the 1st of April 1864, was not an extinguishment of the note in suit, but at most only collateral to it, the original note still being retained by the plaintiff and not being cancelled at that time."

The court answered : " We cannot instruct you as requested in this point. We cannot say as matter of law, that the acceptance of the $500 note was not an extinguishment of the $1200 note in suit. If you believe that the parties intended the giving of the $500 note to be an extinguishment of the other, and not merely collateral to the other promise, though the plaintiff was permitted to keep the note in suit, it was extinguished, if the plaintiff acted freely and not under the compulsion of threats to turn her out of the house, where, you find, she had a legal right to be under the defendant's engagement."

The defendant's 8th point was : " If the jury believe that there was a settlement between the plaintiff and defendant on the 1st April 1864, in which the note in suit was surrendered and a new note given for the balance due thereon, as testified to by Wm. Adams, Esq., and Catharine Miller, plaintiff cannot recover on the surrendered note."

The 9th. " The verdict should be for the defendant."

Both were negatived.

The court further charged : * * *

[" On the whole we instruct you that the plaintiff is only entitled to recover, if you should be of opinion, that under a contract with her brother, based upon a valuable consideration, and fulfilled on her part, she was entitled to live in his house, the home of her ancestors, as long as she chose; and that under threats to drive her out and other ill-usage, the defendant extorted and forced the receipts and settlements from the, without a full valuable consideration for them. Such receipts and settlements as he extorted from her in this wrongful way, she may avoid, and only such. And you must find that such threats were the operative reason and cause of her action, and that without them, she would not have signed them. Her freedom in this regard must have been

[Miller *v.* Miller.]

destroyed by the oppression of the defendant exercised upon her by means of these threats.

"All his importunity, however urgent, or any religious scruples attempted to be excited about taking interest—the plaintiff not being shown to be of weak mind—nor alleging that the defendant succeeded in arousing her religious scruples—will not avoid the receipts. Only the threats to turn the plaintiff out of the home to which she was entitled, where she had lived for many years, and where her sister was, compelling an unwilling and forced action on her part, will have that effect."] * * *

["If you find that what the plaintiff did before 1864, was done only in consequence of the defendant's promptings and importunity, and not upon a well-founded fear of being turned out of plaintiff's house, she cannot be relieved as to those things.] Before that she only speaks of his pointing to the door, saying the carpenter had left a hole, and that she ought to be kicked out, and seems to have been said in reference to her recriminations upon him. But she says that in 1864, he said: 'You (her sister and herself) must give up the $1000 or leave the house.' If you believe the plaintiff it would seem that the last $500, at least, was surrendered in fear of being turned out. It is for you to say, but the impression left upon us by the plaintiff herself was that the threats made before 1866, were not sufficient to excite a well-founded fear of being turned out of home and house, and that she did what she did for the sake of peace." * * *

["She can recover only on the ground that the unjustifiable oppression of her brother, in threatening to turn her out of the house, where he had solemnly engaged she should remain as long as she lived, destroyed her freedom, and that she was virtually not assenting to the receipts and settlements. The plaintiff must have had a right to remain in the house under the agreement alleged. The threats of the defendant to turn her out, and his other conduct (but without the threats to turn her out the other conduct would not be sufficient), must have so operated on the mind of the plaintiff as to destroy her freedom in the signing of the receipts and making of the settlements. That is, she must have been so constrained by the threats and other conduct that no matter how much she desired to avoid signing the receipts and settlements, and how she strove against it with herself, she was unable to resist the influence of the constraint, and was forced to yield to it. Where one is in prison, or labors under threats of great bodily harm, there is still and always is a possibility of resisting and of suffering the imprisonment or great harm, rather than yield. But the mind may not be able to resist the desire of freedom, or to escape injury, and to be forced to submit. That is duress. So in this case. It was of course possible that the plaintiff might have resisted the threats and left the house. That

[Miller *v.* Miller.]

would depend upon her firmness of mind and attachment to her home. But if her firmness of purpose and attachments were not in your opinion of sufficient strength to resist the influences of the threats, and they overcame her, strive against them as she would, then they destroyed her freedom, and the receipts are not truly her receipts.] The threats must have been to exclude her from the house unless she yielded her money. If they were, unless she ceased her charges and recriminations, they amount to nothing. She was only entitled to remain in the house on condition of quiet and civil behavior."

The verdict was for the plaintiff for $1666.

The defendant took a writ of error. He assigned for error the admission of the evidence objected to, the answers to points given above and the portions of the charge in brackets.

*Kennedy & Stewart, W. S. Stenger* and *W. Adams,* for plaintiff in error, cited as to duress *per minas,* 1 Blackstone's Com. 130; 2 Inst. 483; Co. Litt. 253; 1 Broom's Maxims 162; Stouffer *v.* Latshaw, 2 Watts 166; Roy *v.* The Duke of Beaufort, 2 Atk. 193; Harris *v.* Tyson, 12 Harris 361; Powell *v.* Hoyland, 6 Exch. R. 67; 2 Greelf. Ev., §§ 301, 302.

*J. McD. Sharpe, F. Kimmel* and *W. McLellan,* for defendant in error, cited as to duress, 1 Pars. on Cont. 392; 1 Story on Contr. 480; 1 Story's Eq. J., § 239; Foshay *v.* Ferguson, 5 Hill 158; Collins *v.* Westbury, 2 Bay R. 211; Sasportas *v.* Jennings, 1 Id. 470; Nelson *v.* Suddarth, 1 Hen. & Munf. 350; Chase *v.* Devinal, 7 Greenlf. 134; Harmony *v.* Bingham, 1 Duer 209; s. c., 2 Kernan 99; Stouffer *v.* Latshaw, 2 Watts 165; Harris *v.* Tyson, 12 Harris 347; White *v.* Heylman, 10 Casey 142; Ashmole *v.* Wainwright, 2 Q. B. 837; Wakefield *v.* Newbon, 6 Id. 276; Parker *v.* Great West. Railroad, 7 M. & G. 253; Chase *v.* Devinal, 7 Greenlf. R. 134; Elliott *v.* Swartwout, 10 Pet. 137; 2 Greenlf. on Ev., § 121; Work's Appeal, 9 P. F. Smith 444; 1 Story's Eq. J., § 309.

The opinion of the court was delivered, October 9th 1871, by AGNEW, J.—The plaintiff sued on a single bill for $1200, on which were endorsed sundry credits which were read, and she rested. The defendant then proved and read an entry on the face of the bill signed by the plaintiff, viz.: "This note settled in full," and rested. For the purpose of showing that this entry was made without consideration, and under duress, the plaintiff replied by giving evidence of a parol contract by the defendant to give her a home in his house, and to board her, and to pay her interest at 5 per cent. on his debt to her; and also evidence of threats to turn her out of his house, and to compel her to pay for

her boarding. So far as the bills of exceptions question the admissibility of the evidence, on the ground, that it tended to affect the written contract between the plaintiff and the other heirs of her father and the defendant, to reduce the price of the land he had bought of them, we think they cannot be sustained. The contract for the boarding and lodging preceded, and was no part of the written agreement. Entering into the written contract and getting the other heirs to do so, were the inducements, and were a condition precedent to give effect to the contract for boarding and interest, but the writing was not the evidence of it. That was evidence only of the contract to reduce the price of the land, which was a complete and independent agreement in itself, to which others were also parties. No question therefore can arise as to the admissibility of the evidence on the ground of a conflict with the written agreement. Nor is there any doubt that it was competent for the purposes for which it was offered; but its insufficiency to show such duress as would relieve the plaintiff from the entry of settlement is the true matter before us. Under the charge of the court, as the case went to the jury, no question of fraud, imposition or undue influence is before us, but that of duress only.

We concur with the counsel of the defendant in error that in civil cases the rule as to duress *per minas* has a broader application at the present day, than it formerly had. Where a party has the goods or property of another in his power, so as to enable him to exert his control over it to the prejudice of the other, a threat to use this control may be in the nature of the common law duress *per minas*, and enable the person threatened with this pernicious control to avoid a bond or note obtained without consideration, by means of such threats. See White *v.* Heylman, 10 Casey 142, where the authorities are collected. But mere threats of injury, in regard to property, without a power over it also, to enable the party to execute his threats, are not in themselves duress *per minas*, however otherwise they may enter into questions of fraud or extortion: 2 Greenleaf Ev. § 301; Fulton *v.* Hood, 10 Casey 372; 2 Inst. 483; 1 Black. Com. 130. The constraint which takes away free agency and destroys the power of withholding assent to a contract, must be one which is imminent, and without immediate means of prevention; and be such as would operate on the mind of a person of a reasonable firmness of purpose. A threat to withhold payment of a debt, or to refuse performance of a contract, or to do an injury which may at once be redressed by legal proceeding, will not amount to duress *per minas*. Nor is there a duress *per minas* in equity, which does not exist at law: Stouffer *v.* Latshaw, 2 Watts 168. The power of mind necessary to give assent to a contract is the same in law and equity. A chancellor, it is true, will refuse his aid to enforce specific performance of a contract,

for a reason less than that constituting duress *per minas*, or will set aside a bargain for extortion or undue influence operating upon a weak mind, or under circumstances of a confidential relation; but equity will not set aside an agreement on the ground of duress *per minas* alone where the law will refuse to do so. In view of these principles there was nothing in the evidence in this case to submit to a jury. The plaintiff herself was the only witness to prove threats—the transaction took place in the presence of a third person called by her to attend to her own business—no conduct of the defendant amounting to duress is alleged to have taken place at the time of the settlement. The threat to kick her out, in one part of her examination, was stated to have been made in 1864, two years before the settlement, in another part not remembered as to time, and is not alleged to be expressly on the condition, if she would not give up the bill or note. She says she signed the settlement because he had been at her all winter, and abused her dreadfully and pushed her up to that point; but she adds that she talked against it all winter—called him a skinner and stripper—that the abuse was that he said a great deal—that if we would give it up, we would live and let live. His abuse, she says, was all talk—was saying all the time, you ought, you ought, you ought. She admits that he managed her Maryland property for years, made it yield largely, and claimed a large sum for his services. which she had been willing to secure to him by her will. Her whole testimony shows that there had been a running controversy between them for years about boarding, work, and his services, and that he was constantly importuning her. On part of the defence the testimony of the person called in by her shows that the subject of the settlement was discussed between them for half a day, that the defendant claimed $2000 for his services, and finally by persuasion of the witness he came down to $1000, and the settlement was closed in his presence, the papers produced by her, the entries made by the witness, and signed by her. The parties are brother and sister, and had lived together more than twenty years. She states no threats as the immediate cause of her act; and added to this the only threat she speaks of, was merely such as would amount to a refusal on his part to comply with his own contract to furnish her a home. We can discover nothing in her testimony which is such a duress *per minas* as would avoid the settlement, and the court ought not to have left it to the jury to be found by them on the evidence.

Judgment reversed, and a *venire facias de novo* awarded.